The Honorable The judges of the United States Court of Appeals for the Fourth Circuit Oyez, Oyez, Oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nine and give their attention for the court is now sitting. God save the United States and this honorable court. Be seated. Good to have you all here this afternoon. We look forward to the arguments in this case. Wright v. Lassiter, et al. Mr. Luking, Ms. Luking-Summon, I mispronounced that pretty badly. I'm sorry. Good to hear from you. Good to have you here. You're representing Mr. Wright. I am, Your Honor. Good afternoon. And may it please the court. My name is Michelle Luking-Summon and I do represent Anthony Wright, a Rastafarian man seeking to practice his faith as an inmate in the North Carolina Department of Public Safety through the celebration of seven holy days and holidays. At the bench trial in this matter, Kenneth Lassiter, a former warden at Central Prison and the current director of prisons, explained why Mr. Wright is not permitted to practice his faith. He said the only truly deciding factor in all of this is whether the requested accommodation is a true tenet of the faith. Carlton Joiner, also a former warden at Central Prison, and Betty Brown, who's the director of Chaplains and Seeservants, testified as to the same explanation. Defendants further defeated any claim to a compelling interest to burden Mr. Lassiter explained that if the exercise was a true tenet of the faith, defendants would provide the means for the exercise. Defendants' claims that cost or staffing issues should be considered compelling interests were without merit. Their system-wide policies and practices should be considered here. They allow Muslims, Native Americans, and members of other faiths the precise exercise that Mr. Wright seeks here today. With no added cost to the Department of Public Safety. Defendants' ability to staff 25 religious services a week. Is it your contention that there would also be no added costs here with respect to your client's particular observance of his faith? Your Honor, it's our contention that the added cost would be minimal, if any. One of the things that the district court, we feel like, was incorrect on was the assessment of what the cost of the meals would be. That order completely did not recognize the testimony that was presented at trial that in place at Central Prison and throughout the Department of Public Safety, there are ways to pay for religious observance meals that do not require the Department of Public Safety to pay for them. In fact, they do not pay for those religiously significant meals. Do volunteers come in and pay for them? That is one way, Your Honor. Volunteers are permitted to provide the funding for the meals. Inmates are also permitted to pay for the meals themselves out of their trust funds. There is also something called the Inmate Service Club that raised money through things like pizza parties and whatnot to fund those. But even if those options were not available, even if Mr. Wright or an outside volunteer could not pay for his religiously significant meal, the option exists that Mr. Wright would receive just the regular tray, the regular tray that he would eat in the chow hall, but in a congregational setting and a communal gathering. So, in fact, DPS does not have to pay for the meals that Mr. Wright has requested. How do we, and this is maybe a step back and not necessarily specific to your case, but how do we identify what those options are? I mean, your client initially requests, and I'm not arguing about exhaustion, right? But I'm just saying initially requests what I'll call sort of a gold-plated version, right? I want a goat and plantains and everything that go with it. And as we've sort of gone along, the request or at least your characterization of it sort of continues to narrow down. What I'm struggling with a little bit is sort of how to, the district court should identify where those points are. Obviously, the loop replaces the burden in one area, but you have, you being your client, has some obligation to talk about whether it was actually an accommodation or not. How do we identify what options are really available or how should the trial court have done that? Your Honor, I think what the trial court should have done was taken what Mr. Wright requested, both in his testimony, but certainly also in his requests to the prison. He is the person who has testified. Does he want these feasts or not? He does want the feast, Your Honor. How many? Four. Four feasts per year? Four feasts per year. On a specific menu? Well, Your Honor, I think that is where the court and certainly the prison system, too, has some involvement because we do not think that Mr. Wright is going to receive goat or wine as part of any of his feast days. And in fact, You don't think he's going to receive it or he doesn't want it anymore? He asked for it, right? He did. He asked for it in one portion, yes, at one time. He's a moving target on what he wants. Your Honor, I think that Mr. Wright, I think he, on other occasions, not necessarily as a moving target, but some of the meals require different things. They also require things that are not expensive, like rice and beans. But again, DPS does not pay for those things. Pardon? DPS, the Department of Public Safety, the defendants, they will not pay for something that might be a more expensive food item, even if it is religiously. But the challenge I've got, and I want to keep it on the food item idea, right, is he starts off saying DPS is going to cook me a goat, right? Buy the goat and cook the goat. And by the end, what we're saying is that he's getting the tray of food that he normally gets in the dining hall. I mean, there's a fairly large, like, a range of options there. When the district court is faced with that many options, right, from, you know, cooking the goat and everything that goes with it to, like, providing him the, you know, bologna sandwich that he would otherwise going to get, how is the district court supposed to know where to start? Well, I think respectfully, Your Honor, the district court first has to start at the substantial burden question. I know, but I'm past that. I'm assuming that away. I just, you just were talking about food. Brought me to, I get, we sort of skipped over some steps to get here and I want you to go back. But just on this particular question, it seems difficult when they ask for the gold-plated option. And I'm not saying that they don't have to do some of this. It's just hard for me to identify how the district court goes about looking from the goat to the bologna sandwich and where on that spectrum we're looking at. So that is certainly a very wide spectrum. And if we start at goat and we end at, you know, the lunch tray, that probably the better place to land there is somewhere in the middle. And I think that that's where the least restrictive means analysis comes in here. We, I personally do not believe that he is going to be provided a goat within the Department of Public Safety. But he certainly can be provided with rice and beans if he is able to raise that meal, or if he has an outside volunteer, a Rastafarian member of the community who would provide that. And so the problem, the challenge is if not, if rice and beans, why not rice and beans plus chicken, right? And if you got rice, beans and chicken, then like why not add plantains? I mean, the cost of adding plantains isn't very high. But I mean, it's just, it's a, the nature of the spectrum makes it really hard, I think, for a court to evaluate. And I think, Your Honor, the issue is more that because defendants will not pay for those items, you know, perhaps Mr. Wright has religiously significant items that he is able to afford. Did he ever tell the district court that he knew that the system wasn't going to pay for them? Did he ever tell the district court that he didn't want goat? No, Your Honor. He didn't want chicken. He would take rice and bean. So you're making a new proposal here to this afternoon? Well, Your Honor, respectfully, I don't think it is a new proposal because we did present a testimony at the trial about these options that are available to the other faith groups at Central Prison and throughout the prison system. That there are options to pay for religiously significant meals and that those meals might be slightly different than what a person, you know, has, has sought initially. Certainly, we are still within a prison context and that's important here. I guess the problem, though, is from your perspective, is that the district court never got there because it accepted the prison officials' views that, uh, that this was not, this was not something that they had to adhere to because it was not a core tenet of his belief, right? That's exactly right, Your Honor. And so I get all, I get all the issues with respect to the practicalities of deciding how far to accommodate him. But that first question is the fundamental question in this, in this case, isn't it? We think it is, Your Honor. So we think that because defendants have said repeatedly, um, both when they were investigating Mr. Wright's religious beliefs and throughout the, the case, that what they were looking at was whether or not these requests for meals and communal celebrations comprised core tenets of his faith. In essence, whether his version of Rastafarianism was the real or true version of Rastafarianism. And that is not an inquiry, um, that is correct for the defendants to make. And it's not a correct, um, conclusion for the district court in this matter. Um, the court in, in Hobby Lobby and in Holt said that even if, even if the exercise of religion is idiosyncratic, even if the belief system, um, others believe it is flawed, then that belief system is still protected. And if I understood the record in this case, if the prison officials had gotten to that same conclusion that you think they should have gotten to, then they would have figured out a way to accommodate his beliefs. There could have been a fight about that, I suppose. Maybe your client would have said, no, no, no, this isn't, this isn't going to get it. I got to have the goat or whatever. But that's a different question, right? That is, yeah, that's precisely right. Um, Mr. Lassiter testified at the bench trial that if it, if they believed it was a core tenet of the faith, that DPS had the means to provide for the accommodation. Um, the examples that, that we've gone through already for, um, Muslims who celebrate, uh, Ramadan, Native Americans celebrate the green corn festival. There are other religious groups as well. DPS has many policies and procedures in place. They do this statewide. They do this for an enormous groups of people. Um, what Mr. Wright is requesting here, seven days, um, is certainly not going to break, you know, the, the straw that breaks the camel's back here. Um, Central Prison, uh, where these requests initiated actually already, um, oversees 25 religious gatherings a week, over 1300 religious gatherings a year. Um, so if they are able to support that kind of, um, system for other people to, um, you know, exercise their religions, uh, they certainly have that framework already in place. We're not asking, um, for the court or for the defendants to sort of create something out of whole cloth here. What we're asking is that they acknowledge that, uh, Mr. Wright's beliefs are Mr. Wright's beliefs and he has testified compellingly. He, he has certainly never wavered from that. Um, and the district court, you know, also said that, that they found, uh, his beliefs sincere. Um, but the defendants repeated assertions that because he was not a real Rastafarian or because his beliefs did not comport with mainstream Rastafarianism, that he is not entitled to protection of his religious exercise is incorrect. And that, that we believe was the incorrect finding. He's the only type of this Rastafarian in North Carolina. That is what the record shows. And in the prison system in North Carolina. That, that is what the record shows, Your Honor. Um, I would just point out that... I mean, we have to go with a record. Yes, absolutely, Your Honor. Absolutely. Or you have to sell it, show that there's clear error. Yes, yes, absolutely, Your Honor. In light of that point, and I know your time's about to run out, but you can answer this one, um, in light of that, because the record does show that he's the only one and the core piece of this, we talked about goat being an important part of it, but the, seem like the real core part of it is this communal feast, right? The communal aspect, right? If he's doing it just in his room by himself or cell by himself, that's not the point. Doesn't he have a real causation problem? If there's nobody else that's a member of this faith, um, and he's only really seeking communal feasts, um, doesn't it sort of prove itself that he can't have a communal feast because there is nobody else that shares these beliefs? I mean, a, a, a feast of one is not communal in any meaningful sense, right? Certainly a feast of one is not communal. Um, but what, what is at issue here is that Mr. Wright has never been given the opportunity to have a communal feast. So he certainly, um, you know, can't. But then he had the burden to show that, that his, that the limitation by the department caused the harm that he's complaining on. If there is nobody else, I mean, he has that burden to show that, that their actions caused the harm. I mean, that's sort of the basic idea here. And if he, all he's shown is I'm a group of one. Um, then he hasn't done anything to show that the feast would be communal. Respectfully, Your Honor. I think what his burden is, is to show that, that his religion has been substantially burdened and, and that certainly our position that he has done that. But in that context, it couldn't be a burden to not have a communal feast. Cause he's the only one there. It's, I respectfully, Your Honor, I think it's, he has shown that, that it is a burden on him, but he, because he had not. But he had to show that the department's action causes the burden, right? The burden can't come because like of some exterior reason, right? The whole point is he has to show that the burden is caused by government action, right? That's the framework that he's operating in. And what I'm suggesting to you is what he's shown is that he cannot have a communal feast for two reasons. One, the department won't let him. Two, he doesn't have a community. He doesn't have a second person. Doesn't need a hundred people, but he doesn't have a second person. And if he doesn't have a second person, then he's not, the injury that he's complaining of is not caused by, is the theory I'm positing, the government's action is caused by the lack of any compatriot. I think, Your Honor, what we, what we do not know is if there was a communal feast scheduled, whether or not there would be others that would join that feast, we certainly know that there are other Rastafarians within the department of public safety. The department of public safety does not divide their Rastafarians into other members of the sect. So while the record does reflect that, that what we know is that Mr. Wright is the member, is a member of the Ba'a Beta sect. We don't know for certain that there are not other people who would ascribe to that same faith, to that, to that same religious exercise. But what we- We know on his record, he's the only one. Yes. You've said that before. But what we also know is that he has not been given the opportunity by defendants. And the defendants- So what does that mean? What would that look like, the opportunity? The opportunity? Your Honor, I think what that would look like is a scheduling of the religious gatherings and the religious meals at a specific time and place. Presumably there would be some sort of signup sheet. If nobody signed up for the communal feast, it would not happen because we cannot have a feast of one. But, but our position is that because- I agree that the department has the obligation to create evidence of a community when your client hasn't shown any evidence of a community. I mean, I, I, you're absolutely right. He could have a community feast and Muslims and Jews and Christians and anybody that wanted to could show up. But his, the allegation he's made is that my sect is going to get together. And this is our belief. And I'm not trying to challenge his belief, to be very clear. I'm just, I'm sort of skipping past that point to the core question. He still has to show that, like, he's got to show the evidence, not let's let the department set up an experiment that might generate the evidence. I mean, that doesn't seem like the right approach, does it? It doesn't, Your Honor, because we're not asking that the, the, uh, the department set up an experiment. What we're asking them is to comply with our LUPA, to provide Mr. Wright with the least restrictive means available to them so that he can practice his religious faith. We think that what that least restrictive means looks like at this point is the opportunity to engage in communal gatherings, four of which would include feasts that he would pay for, um, that would not incur additional costs to the department of public safety. Did he represent to the court that he would pay for them? He did, Your Honor. Yes, I try. Um, Your Honor, just really briefly on, I'm sorry, I'm over time. No, but you go ahead. I was just going to say, Your Honor, that one of the, the other issue that we have not addressed is, is the compelling interest question. Um, and here defendants really did not come forth with, with any compelling interest as we talked briefly about the cost issue, um, and what they came forward with is that this would cost them $500,000, which is absolutely not correct. Um, and we feel like the record... Did you come up with a different number? Uh, the number that we come up with for, in terms of, uh, the meals is zero, Your Honor, because he will either have those meals provided for himself. He will pay for them himself. They will be provided by outside volunteers, or he will have to eat, uh, the tray because that is what their policies require now for other faith groups. It is possible that... But they, but the number the judge found was based on the evidence. That's what the testimony was based on who he wanted to invite and what they'd have, provide security and all that with it. And they came up with $500,000 for the, for the four of them, I think, for the year. Respectfully, Your Honor, that, that number... But you say that's clear error. That number actually came from defendants' testimony, which they contradicted themselves because they provided the same testimony that Mr. Wright... That, that is correct, Your Honor. Um, and we, uh, we would rely on the fact that the, that defendants have come forth with a compelling interest, um, in trying to justify their decision here, but really what their decision rested on, and we think what the district court's decision rested on, um, was the fact that they do not think that Mr. Wright's beliefs comport with, uh, the true tenets of Roscoe Cronkite's policy. Let me ask you something else before he gets up here. Uh, there were two experts on the religion, one called by each side. And, uh, Judge Dever, uh, credited the one called by the defendants, uh, Mr. Price, I think it was, who was a professor at the University of North Carolina, Chapel Hill, and the, uh, uh, Mr. Severin was called by your client, and the judge didn't credit him. He said, he specifically said he did not credit him. Uh, how do you get past that on what the meaning of the religion, Rastafarian religion is, that we have, don't we have to accept what Price said and disregard what Severin said? Uh, no, Your Honor. We don't. No, we don't have to accept. Well, the judge said he credited one, didn't credit the other. He did, Your Honor. So you had to, then in the alternative, we have to, you had to show us that the, his ruling, one of the rulings or both were clearly erroneous. Your Honor. Was this a bench trial? Yes, Your Honor. So, so what we, what we believe is that, um, what the district court did in this, in this case was fully credit Dr. Price's interpretation of Rastafarianism. Dr. Price testified himself that he would not tell another Rastafarian, um, what to do or, or what his faith was. Nevertheless, he, um, endorsed a view of Rastafarianism that did not include, um, these seven gatherings and these four feasts. What we presented at trial was, uh, Mr. Severin, who was a member of this specific sect for the Babeda, um, the Babeda sect of, of Rastafarianism. He was a former chaplain in the New York state, uh, prison system. Um, the, the fact that the judge wholly adopted, uh, Dr. Price's, um, interpretation of Rastafarianism while wholly discounting Mr. Severin's, we think is further evidence of the fact that the decision was based, uh, not on compelling interest or, um, or, um, whether or not his, his religion was substantially burdened. But the court decided that he was not substantially burdened because he was not practicing Rastafarianism correctly. That those things that he had requested were not required. And because they were not required, he could not be burdened by them. Um, and we think that that decision was wrong by the court. Okay. Thank you. Thank you. Mr. Park. Thank you, your honors. And may it please the court. So I'd like to start out, uh, where, uh, most of the last discussion, uh, focused on, which is the true tenant argument. So I'd like to clarify one thing about the district court's order first, which is that the district court never accepted that argument and we have not pressed it on appeal. Uh, the argument that, uh, the denial was proper because it did not match, uh, the belief systems of mainstream Rastafarianism. Uh, the district court on, this is at JA 830, that, that where he discusses why he finds no substantial burden. He never mentions true tenant. He instead makes two factual findings, uh, that we believe foreclose Mr. Wright's arguments on appeal. So first he finds as a matter of fact, uh, that Rastafarians can celebrate communally all of their holidays during weekly services. These are services that central prison provides and facilitates for, uh, the inmates of that faith. And second, he makes a factual finding that Mr. Wright can celebrate the holidays during regular mealtimes. Uh, he found that, uh, I would quote from the order, uh, that, uh, page 13 of the order and this is joint appendix 830. Uh, he, um, judge never found as a matter of fact, Rastafarian inmates are free to gather with other Rastafarian inmates at regularly scheduled meal times to eat together and to celebrate a Rastafarian holy day. Uh, and, uh, this, uh, as, uh, judge Richardson noted, uh, departs from, uh, the initial request that Mr. Wright asked for, um, for these feasts with goat and wine and to actually the initial request is to allow all inmates to attend these feasts. Um, but as the case is presented here today, uh, the, you know, the relevant gap between what Mr. Wright is asking for and what he was actually provided according to judge Devers order is very, very small. Uh, and so I think the gap is essentially, uh, he wants a separate gathering as opposed to a gathering during regularly scheduled meal times, you know, at a table in the chow hall. Um, I will say that, and this is reflected in the record that all the other faith groups, when they have their own religious meals, it's in the dining hall, uh, with the regular food tray, unless an outside group, um, pays for the meal or the inmates are able to collect their own funds and pay for the meal. And, uh, so the, the really, the only difference that we're arguing about today is whether there should be a separate gathering, uh, of Rastafarian inmates. Uh, and, uh, I would, I guess, submit that this is how, um, the interaction between the two parts of the substantial burden test, uh, really reveals itself, which is that what would you all have a gathering of one or a gathering of 25 or gathering of 82 or whatever it is. So, uh, the gathering here would be, uh, or what he was allowed to do was gather with any inmate in his housing unit. Uh, this is what Director Lassiter testified to that, um, he could gather with any other Rastafarian inmates in his housing unit, uh, and, uh, uh, Warden Joiner, who was the warden of Central Prison, submitted an affidavit saying there are 25 Rastafarian inmates, uh, in his control status. Uh, and, uh, uh, just as a point of clarification for the record, control status and housing unit are synonymous at Central Prison. Uh, and I think this is actually shown by Chaplain Dunstan's testimony where, uh, she is, she was Mr. Uh, Wright's chaplain or one of the assisting chaplains at Central Prison. And she said that again, like Director Lassiter, uh, that, uh, he could eat with all the other Rastafarian inmates, um, in her, in his custody level. So custody level and housing unit are the same. Uh, there were 25 registered inmates, uh, in his custody level, uh, in his custody level, uh, and, uh, uh, Warden Joiner submitted the affidavit. And that must be where I got that number. Yes, that's, that's correct. Um, there were, and this is reflected, I would, uh, in, uh, um, late in the record, around 759 to 783, uh, these are the quarterly, uh, attendance sheets for the, the regular, the weekly services that, uh, the prison provides for Rastafarian inmates. And it shows that any, up to nine Rastafarians in his unit, in unit five, uh, would attend weekly services. And so there are about 25 registered Rastafarian inmates and up to nine were actually devout and going to, uh, the services, uh, on a week in, week out basis. Well, but I guess the weekly services don't necessarily coincide with the dates of the, of the particular feast. And at least not always, I wouldn't think, right? Yes, that's correct. So is that a sufficient substitute? So I think that, that is a closer question, Your Honor. But I think that the, the week, the regular mealtimes, which of course are three times a day, uh, where anyone in his housing unit could, they could just eat together in the regular meal hall and pray, worship, celebrate a communal meal. Uh, and so the real relevant distinction isn't the timing, it's whether, uh, they should have hosted a special service, uh, at a different mealtime, uh, the, for the other, uh, the testimony of the prison officials was that, um, usually these have to happen after hours or before hours, um, to accommodate a special gathering, uh, and so, yes, Your Honor. Well, so to be sure I understand what you're, what you're saying is that he has alleged somewhere in this record that there was no guarantee that there would actually be other Rastafarians, uh, in the dining hall at the time that he would be eating his, his meal. And so no guarantee that he could actually engage in this communal feast. But you say that the judge found otherwise on this record. Exactly, exactly. And so there was a factual dispute, uh, at trial about this question. So Mr. Wright testified, uh, that he could only eat with other members, um, of his floor. So there's a housing unit and there's several floors. And so he said, you know, we come out only by floor and I could not eat, uh, with another Rastafarian inmate unless they were on my floor. Um, but Director Laster and, uh, Chaplain Dunstan testified to the contrary. They testified that anyone in your housing unit you can eat with. And so there was a factual dispute and, uh, Judge Dever resolved that dispute in the state's favor. Isn't there some evidence in the record though, uh, at least, uh, um, some indication that the prison officials were willing to go further and, and accommodate him to the fullest extent possible, but for the fact that they simply didn't consider, uh, his allegations as the core tenets of his belief to be correct. And isn't that problematic? So I, I would, uh, give a factual and a legal answer to that. So to first as a legal matter, uh, it's not relevant. Uh, this court has held in Smith v. Osmond, the case that Judge King, uh, joined the panel decision on that, uh, the substantial burden standard is an objective test that the subjective good or bad faith motivations of the prison officials are not part of the analysis. Uh, you know, there could be an equal protection claim, uh, if there were some  that's not what we're presented with here. And, uh, so the relevant analysis is whether, um, it's an inmate focused analysis. So did the inmates religious exercise, um, wasn't burdened substantially by the prison's policies. And that is not, uh, you know, cured by a good faith motivation, uh, of a prison. And it's not enhanced by a bad faith motivation. It's just not a part of the RLUIPA analysis. I would say as a factual matter that here, um, we're in a unique situation for two reasons. So first is that, uh, he is claiming to, uh, as Judge Richardson noted, uh, to want a communal setting. And so the, uh, inquiry as to whether there are other inmates who would join him in these meals, uh, is a proper inquiry for that claim. I think, uh, I think more broadly, uh, he is not claiming to have a personal religion. I mean, there are certain cases that this court has had to grapple with that are very difficult because the inmate is saying, I have a personal belief system, uh, and I want these accommodations to match that belief system. But he does not claim that. He's claiming to be a member of an established sect of Rastafarianism with a fixed set of orthodox beliefs. And so it's only natural and proper for the chaplain, uh, Betty Brown, who is, who her job is to, you know, resolve these requests to say, well, is what you are asking for a part of that fixed orthodoxy? And Mr. Wright himself, uh, he, you know, presented as an expert, his priest from prison, from prison. Uh, this is the man who, uh, as Mr. Wright argues in his brief, uh, or notes in his brief was the man who educated Mr. Wright about Rastafarianism. Uh, and I would, I guess, point to a few things in his testimony that, that we think, uh, are problematic on this question for Mr. Wright. So he, we asked him, um, so the essential burden standard as the court knows is- You were involved in a trial? I was not, Your Honor. I was not, Your Honor. The trial counsel has left, uh, the Department of Justice. Uh, so the, uh, we, uh, asked him, trial counsel asked him, uh, asked the priest, does it violate your belief system to not eat certain foods at a religious gathering? And as this court knows, that's the relevant standard from, um, uh, loving and other cases, you know, a substantial burden is one that forces the inmate to violate their religious beliefs. Uh, and so we asked him, it's not a gotcha question. Does this violate your belief system? And at JA 314, uh, the question is, is it a violation of your faith not to eat certain foods like goat or wine? And, uh, Mr. Wright's priest said no. Um, and so we followed up later, this is JA 321, uh, would, uh, Mr. Wright be violating any laws or tenants, uh, practices of the belief system not to celebrate the holidays in a quote corporate ceremony or not participate in a feast? Uh, that's a quote as well. And Mr. Severin, his own priest said no. Uh, so you're relying on Mr. Severin, who the judge said was not credible. Yes. Yes, Your Honor. So, I mean, I would stipulate for, you know, this analysis, uh, that we can credit his testimony. I think in terms of the relevant factual dispute between the experts, it's really about what other Rastafarians practice. So Mr. Price, um, was not familiar with the Babida Christian sect and, but he testified that a lot of the requests that Mr. Wright is asking for actually would be contrary to the, the belief system. But he was a Rastafarian himself. He is, yes, Your Honor. Yes. And a professor of religion at Chapel Hill. And he, um, testified, for example, uh, that most Rastafarians are vegetarian and would not be allowed to even eat these foods at a feast. Most Rastafarians are, uh, um, under, um, mainstream sex, uh, cannot drink alcohol. And so these foods would actually prevent them from attending the ceremony or for having a religious reason for attending the ceremony. Um, and, and again, you know, this interacts with the two parts of the test. Does Mr. Wright want wine available? He does want wine. Yes. Or he, um, in his complaint, Can a prisoner make alcoholic beverages available to prisoners? Uh, the prison policy is to not do that. Um, there is one case, uh, where, uh, we have provided wine to a Catholic inmate, uh, to engage in communion. But, uh, as a general matter, uh, alcohol is, uh, is not allowed in prison. So, uh, and the reason why this relates to substantial burden is again, his claim is that he wants to celebrate communally. He never claims that the prison restricts his individual worship in any way. Uh, and, uh, so I would, I guess, turn, rely again, uh, on, well, in rights reply brief, you know, he acknowledges that he has no right to group services if there are no, if there are no other inmates who want to, uh, attend the ceremonies with him, to celebrate the holidays with him. Uh, and so again, as I think the previous discussion illustrated, uh, we're kind of at an evidentiary burden question as to, uh, whether, um, the prison has to affirmatively show that no one else would attend or if that's Wright's burden. But this court has decided that question in, uh, in Lovelace and it, and actually the real loop specifically, uh, decides this as a statutory matter, that the inmate has the burden to show a substantial burden. And then if, uh, the inmate has made that showing, then it becomes a state's burden to justify, uh, why it's imposing that burden. Did the bill ever try to settle this dispute? Uh, I don't, I don't believe so, Your Honor. I think that if the way that it was presented, even at trial, the primary, um, submission by Mr. Wright was that he wanted... Well, you're telling us there's not much difference between what they want and what you're willing to accommodate. That's correct, Your Honor. Or what we have already accommodated. That's what you're telling us this afternoon. Exactly, Your Honor. Yes. Uh, and I, I think, you know, you know, up until the briefing, uh, late in the briefing today, uh, in this appeal are, um, you know, we were addressing Mr. Wright's primary submission, which is he wanted the feasts, uh, and, uh, not that he wanted the regular meal tray. That was more... And you understand now he doesn't want the feasts? Uh, if that was, uh, if that, if that were the... That's the way you, that's sort of the way you characterize the reply brief. Yes, yes, yes. That's correct. And so I guess I would return to, uh, kind of the beginning of the presentation, which is that we've already provided the regular meal tray and we've provided a system for him to celebrate his holidays communally in the regular, uh, dining hall. And so the real, the legal question here, at least, um, is whether it's a substantial burden for them to require them to meet in the dining hall on a day in, day out basis, or whether they have to give a special gathering. Uh, what do, what do we make of this? I'm going to go back to the substantial burden point. You, you sort of cite to the court's opinion at 830, um, and you, you cite the last line talking about gathering at breakfast or at meals. One of the challenges I had here, and I want you to explain to me how I'm supposed to read this. This is talking about substantial burden. Um, yet when you read it, uh, much of it is addressing the lack of staff to do other things. Um, which seems we're not, you first read it to conflate the two inquiries, right? Whether there's a burden or not, doesn't turn on the existence or lack of staff or resources or security or anything else. And so when you, when you read it on its face, right? The lack of staff and money, the lack of staff to celebrate, it reads as if the district court found no substantial burden because the department lacked the staff and resources. You would agree if that was the conclusion that that would be wrong? Yes. Yes. We would agree that that would be wrong. And so help me understand why I'm not supposed to read it that you, you understand what I'm, what I'm getting at here. Yes. If you take that last paragraph on the bottom of 830, um, you're in essence asking me to excise, um, you know, sentence, um, whatever it is, three, uh, and at least part of sentence four that talk about, you know, the, the interest, piece of this in rejecting the burden analysis, right? Yes, Your Honor. Yeah. We, uh, agree that that was an improper part of the initial analysis. Um, but we don't think that that requires a remand, uh, for an additional inquiry into substantial burden. I think, uh, the record and the facts that were found are enough as a legal matter to show that, um, the really the, the difference between what he has now and what he had initially was a, a de minimis burden. Uh, but, but we're, we're sort of doing that. We're sort of left to do that almost on our own. Um, so really in, in reality, why wouldn't we send it back to the district court? Help me understand as a more prudential matter, given what I, I gather to be everybody sort of recognizes this full paragraph on the bottom of 830 didn't exactly get it right. Um, why wouldn't we send it back? I know this has happened before, but send it back with the sort of instructions to say, Hey, not that you can't get there, um, but you can't do it this way. I think the court could do that in its opinion without a remand. I think, uh, I mean, I, I would read the, this paragraph as setting out two independent grounds for, uh, but interwoven, right? I mean, it doesn't set them out as here's point one, here's point two. He sort of weaves them together. I mean, the, I mean, the connector that judge never used is more, more over. And I guess you could debate as to whether that's, you know, a part of the single analysis or a separate reason for, for his conclusion. I mean, I guess the secondary reason though, right? The primary reason is, you know, money and resources. Yes, Your Honor. Yes, Your Honor. And I guess, uh, I mean, two, two responses. I think that that's legally sufficient on its own, uh, that, um, that there's very little, uh, gap in between what he's asking and what he, he wants. And I think then you would turn, uh, to the second part of the analysis on, on the state's compelling interest. I think, uh, as Director Joyner directly testified that there is a really a catch 22 issue here on that part of the test. And the first is, you know, if you give this to everyone, it has enormous cost implications as the court found and security implications because you're either having to. But isn't that slippery slope argument one that we're not really allowed to do that in evaluating the interest? So I think what the Supreme Court has held is that you can't just say, we want to have a policy and that's it. And that's, you know, that interest in uniformity is compelling interest. Uh, but what it has not said, uh, and what has clarified that it was not doing is, is saying that, um, you know, you can't look at the impact, the system wide impact of providing an accommodation. So in Holt, where this comes up most recently, uh, they said that, um, you know, uh, that the government had not advanced any cost or efficiency rationale for the Beard policy, that it was just, they had just issued a security rationale and that that was improper. I guess I would, Holt is also instructive in one other way that helps on the specifically said that his belief system required him never to trim his beard. That's at 856 of the Court's opinion. But, uh, what his actual request was for a half, a half-inch beard and for that limited accommodation relieved the substantial burden. Uh, and that we submit is what the State has done here. Uh, you know, he says that as a matter of religious practice, he wants these feasts, he wants a big communal celebration. And what we have given him is equivalent to the half-inch beard. We said, uh, we have a strong interest in not providing, uh, accommodations of that level, um, but we will give you something that relieves your substantial burden, uh, in the same way, which is. How many answer the question that I asked your colleague, you know, that you show up in the court system and the trial begins and he's asking for the Cadillac version, right? Now we're at the bologna sandwich version, right? How is a district court supposed to like figure out where on that spectrum? Do you have any guidance for us, um, on, on how a district court is supposed to do that? He's asking for Cadillac, you know, you, there's a bologna that's, that's down here. How, how do we do that analysis? Yeah, I agree. It's tricky. I guess I would refer the court to the couch VGA decision that this court has decided. Uh, that was Traxler decision, uh, with joined by Judge Shedd and Justice O'Connor. Uh, and what. Is that last year? Uh, that was, I think in 2012 or thereabouts. Um, but, uh, the, the court there said that, uh, the state has to consider alternatives that are proposed by the inmate and it has to, do they have to be proposed by the inmate? Is that, is that part of that holding that you have to, they have to be proposed by the inmate before you have to consider them? Yes. I believe that that's part of the couch VGA analysis that, um, you know, the department doesn't have the freestanding obligation to consider all possible accommodations that, but what it has to do is during the course of litigation, at least is to explain why those particular accommodations, uh, aren't, and this is the quote from the opinion is aren't as equally as successful, uh, in furthering the, the, the state's compelling interests. Uh, and so, uh, it's, uh, uh, so I guess I would, I would say that is that what the district court should do. And I realize I'm running out of time. You go ahead.  Thank you, Your Honor. Uh, so I think what the court should do is say, what is your claim? Um, and is that claim required under Lupa or the first amendment? If the answer is no, then what are your alternatives? And has the government, uh, offered a reason why it cannot provide those alternatives? I think the answer, when is that? So I presume you don't believe that's like an exhaustion requirement at the administrative stage. Yes. Where, where is it? At what point in time, I assume you think pre-appellate brief, but at what point in time does the plaintiff have to offer the alternatives that he or she wants evaluated? That's a difficult question. I don't know if that moment in time question has been decided by this court of the Supreme Court. Uh, I think. Well, the court shouldn't have to tell you all everything. I mean, I'm asking you right now. The general principle that I subscribe to in these things is the warden not to run the penitentiary. I mean, that's what the obligation is. Yes, Your Honor. The jailor in charge of the jail and the courts ought to stay out of it to the extent they can stay out of it. Right. But we got Lupa and the constitution sometimes need to be dealt with as well. Yeah. So I was wondering why y'all didn't sit down and try to work something out. Well, uh, I think that make a lot of sense to me. I think that we would explore that following today, given the representation of it today, I think, I guess to answer your question, I think that at every relevant. We started out in one piece with goats and chickens and all this. And now we're down to beans and rice. And bologna, sir. And bologna. Sorry. I think the bologna's are mine, by the way, I don't think he's actually asking about it. We got judges in here and lawyers arguing about things on a, in an afternoon that we would normally be preparing for tomorrow's case. Well, we appreciate you being here again for a second time. I think we're glad to have you all here. But I think to answer judge Richardson's question, I think it's at every relevant stage where there's a dispositive motion. Uh, if the state has met its burden to show why the requested accommodation isn't required by the law, then to keep the claim alive, the inmate at that point in time, either on the pleadings summary judgment, and then at trial has to show that they're all alternative, all, there are alternatives that, that, um, the prison could consider. But you answered it there. Any suggestions of, of, of possible resolution had to come from the other side, had to come from their side. I mean, they can engage in a dialogue. I think as a practical matter, that's correct. I think, uh, as a legal matter, uh, it's not necessarily, uh, the case there is, um, we cited a brief sum. Well, it ought to be a case, ought to be the case with lawyers that are reasonable. Right, right. I think that, you know, in a mediated kind of settlement process that that is correct, I would point the court to the, uh, Justice Sotomayor's concurrence in Holt actually, uh, where she clarifies her understanding of the majority opinion. And she says, you know, of course that, uh, the prison doesn't have to, um, Uh, during the course of litigation in response to proposals that have been made by the inmate, I think to relieve this concern, uh, as to the moving the, and it's natural for the request to be a moving target here. Uh, and so how do you, but how do you square this idea that the burden is on the plaintiff to propose alternatives because I, and I don't know this, correct me if I'm wrong, RLUIPA assigns the government the burden of showing narrow tailoring, right? And so it seems a little odd that RLUIPA gives you the burden, but you turn around and say, I mean, reasonably, but it just seems inconsistent to say the plaintiff has actually the burden to put forward the alternative means it's almost creating some burden shifting process that doesn't seem perfectly clear, at least from RLUIPA, does it? Well, I think it would be a little bit different. I think that this would be an entirely second stage of the analysis. So I think this discussion has been predicated on the assumption that the initial request, the gold-plated request is not legally required. And so the question then becomes, do you just dismiss the case or is there some legal obligation of the state to see if a secondary request should be granted? Uh, I think to turn it back to this case, I think that we are already there, uh, because where we've whittled it down to is simply the regular meal tray, uh, in the regular dining hall, uh, and with other Rastafarian inmates, which the evidence showed Mr. Wright was available to him. I think just in closing, unless there are no further questions, uh, I think this is a fact specific case. I think this court can decide this case on fact specific grounds, uh, and the clear standard, um, uh, justifies an affirmance here. Thank you very much. Thank you. And you have saved some time. We're going to go right ahead. Thank you so much. Your Honor, what my colleague has pointed out a couple of times up here is that there's a small gap between what, uh, Mr. Wright currently has and what DPS, uh, or what, what he has sought. But in fact, that that's not correct because what Mr. Wright has sought is a seven holidays, which include four meals or four feasts in a congregational setting, something that is, um, quiet and, and befitting of a religious service. So defendant's position that Mr. Wright could, could partake of the, these solemn days, these days for reflection and, uh, for religious celebration in the middle of a chow hall in, uh, the prison in downtown Raleigh is just, um, it's not correct. Do you agree that all other, just as a factual matter, that all other religions that include feasts, um, do it in the chow hall? Is it actually called chow hall or is that like vernacular that we're using? I think that's vernacular, Your Honor. Okay. The dining hall or whatever we want to call it. Um, Your Honor, I agree that, that those feasts may happen in the dining hall, but they do not happen during the regular meal times when, as Mr. Wright testified, people are being called by floor to leave their housing units and go down and sit down at their table and eat their meals. Um, what is happening is that these religious groups, uh, Muslims, Jews, Native Americans have the opportunity to gather as a group together, whether or not they are housed with the other members of their, of their faith or of their sect so that they can partake of a religious service. That, that is what Mr. Wright is asking. And certainly when we go back, uh, to your, to your Honor's, uh, questions about how we get from the Cadillac version to the Bologna version, that, that is entirely on, you know, the, the narrow tailoring part of this case. What Mr. Wright has shown is that he has a substantial burden, that, that his beliefs require these seven gatherings. And that walking down to the chow hall and maybe being able to run into a Rastafarian brother is not sufficient to celebrate these days. But he can't run into a Rastafarian brother of his type of Rastafarian name because there's none in the prison. There's none else. There's no other one in North Carolina under the evidence. Your Honor, he could run into other Rastafarians. He could run into other Rastafarians, which he undertakes to distinguish himself from. Yes, Your Honor. And Babetta is certainly a different sect than, um, the, the other sects of Rastafarianism. But they are not completely, uh, divorced from each other. They, they still hold, you know, some beliefs that are the same. They, core tenets. They believe in Haile Selassie. Well, that, that, that is Mr. Wright's belief. You know, Rastafarians, you know, are, are, uh, very supportive of, of nature and, and of the world and they are peaceful and, and, and that is, I would say, what their core tenets are. Well, I guess, so let me, so let me ask you about this causation issue because that's what you're, I think you're talking about, and I think it's fair, a fair argument to say that, um, the prison officials never allowed him on the front end before litigation ensued to make out, uh, a causation by showing that others might show up at this feast. But then you get to the litigation and I guess at, at that point, what is wrong about the notion that it was your client's burden to actually show that there were others who would be interested and would actually join him at this feast that otherwise would be a feast of one? Your Honor, I think what that asks Mr. Wright to do is to, to create this community of... uh, as part of his proof. We ask that of every litigant. Certainly, Your Honor. And, and Mr. Wright was a pro se litigant, um, until, uh, the trial. He had lawyers there. You were representing him at the trial. We represented him at trial. And you called witnesses. We did, Your Honor. However, we were not engaged in the case prior to that. Um, and Mr. Wright was, was a pro se prison inmate, um, at, at Central Prison. Well, he came up here pro se and we sent it back, didn't we? That, that's correct. That's right. He, he, he won his appeal. That's right. Then we sent it back and that's when you, that's when you got to trial. Because he's pro se, he can like avoid causation, right? No, Your Honor. We don't. But, but what we do take the position is that he has never been given the opportunity to hold a religious feast. So he couldn't invite people or ask people if they were willing to come to a religious feast, which has never... But, but causation is often, I mean, that, that would suggest that every case, like you have to go through with the action before you can determine with absolute certainty, whether causation exists, but we allow evidence of causation to be entered all the time. For example, his colleague comes in and says, listen, if he held this feast, I would show up to it, right? I mean, that if he had a guy that says this, that's his compatriot, we've got an, we've, at least we've got a discussion about that, but like, that's what evidence of causation is. It doesn't mean, well, go do the action and see if it has the effect that I want it to have. I mean, that, that sort of puts the cart before the horse, doesn't it? Your Honor, we acknowledge that that is a difficult question in this case, certainly. And we, what we would also bring to the court's attention is that the defendants have never based their decision on whether or not there were other members of the Babeta sect. The defendants based their decision on the fact that Mr. Wright, that his beliefs did not comport with the true tenets of Rastafarianism. But don't you agree that, that, I mean, you know, as your colleague pointed out, you're not making a bad faith claim. We get to look at sort of their current iteration, regardless of what the warden said at some juncture, right? Don't we get to look at the rationale provided at this time? We believe you do, Your Honor. Yes. But we believe that the district court's order skews so clearly with what Mr. Wright did not comport with the true tenets of Rastafarianism, that that is what the decision was based on. And that the arguments that were made regarding cost or security or staffing were not supported at trial. There was not a sufficient evidence that there was a compelling interest to burden Mr. Wright's belief. And there was little to no evidence provided at all regarding least restrictive means or narrow tailoring. Um, and we think for those reasons, the case should be. I interrupted Judge Diaz. No, no. I don't have anything further. I'm good. Or do I? Thank you very much. We appreciate your work. Uh, and we'll come down and, uh, re-counsel and adjourn court till tomorrow morning at, uh, nine o'clock. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court. Thank you.
judges: Robert B. King, Albert Diaz, Julius N. Richardson